Michael SESTICH, Petitioner,

v.

LONG BEACH CONTAINER TERMINAL; Signal Mutual Indemnity Association; Director, Office of Workers' Compensation Programs, Respondents.

No. 00–70978.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 5, 2001.

Filed May 20, 2002.

Robert W. Nizich, San Pedro, CA, for petitioner Michael Sestich.

William N. Brooks, II, Aleccia & Brooks, Long Beach, CA, for respondents Long Beach Container Terminal and Signal Mutual Indemnity Association.

Carol DeDeo and Laura J. Stromski, U.S. Department of Labor, Washington, DC, for respondent Director, Office of Workers' Compensation Programs.

Before LEAVY, T.G. NELSON, and W. FLETCHER, Circuit Judges.

## OPINION

WILLIAM A. FLETCHER, Circuit Judge.

Michael Sestich appeals the Benefits Review Board's ("Board") decision affirming the Administrative Law Judge's ("ALJ") termination of disability benefits under § 908(c)(21) of the Longshore and Harbor Workers' Compensation Act ("Act"), 33 U.S.C. §§ 901–950. The Act provides compensation payable "in respect of disability" which "results from an injury," 33 U.S.C. § 903(a), and provides benefits equal to two-thirds of the difference between an injured worker's pre-injury "average weekly wages" and his post-injury "wage-earning capacity." 33 U.S.C. § 908(c)(21).

Sestich contends that he has lost "wage-earning capacity," within the meaning of the Act, to the extent that he cannot earn what he would have been able to earn absent his injury, and that he should be awarded benefits equal to two-thirds of that loss. Thus, Sestich contends, his benefit amount should be equal to two-thirds of the difference between his current actual earnings and the amount he could be earning absent his injury.

The Board rejected Sestich's contention. It held that his "wage-earning capacity" within the meaning of the Act is equal to his actual post-injury earnings, and that he is entitled to two-thirds of the difference between his "wage-earning capacity" and his pre-injury "average weekly wages." Because Sestich's post-injury "wage-earning capacity" exceeds his pre-injury "average weekly wages," the Board held that he is not entitled to benefits.

We agree with the Board.

## Background

Sestich sustained a back injury on December 30, 1988 while working as a longshoreman for the Long Beach Container Terminal. In 1992, Sestich was awarded permanent partial disability benefits of $150 a week. After an operation, Sestich's back condition improved sufficiently to permit him to work, at least for a time, as an uncertified crane operator. He was regarded by his supervisors as a "very productive" and "safe" operator with a "real smooth touch." His supervisors said they would "readily hire" Sestich as a full-time crane operator if he became certified. However, the physically demanding nature of the job aggravated Sestich's back condition, and he was unable to continue working as a crane operator. In 1997, Sestich began working as a marine clerk, which is a desk job. Sestich has been able to fulfil his duties as a marine clerk without undue strain on his back.

Sestich's actual "average weekly wages" as a longshoreman in 1988, prior to his injury, were $921.78. In 1998, working as a marine clerk, Sestich earned average weekly wages of $2,059.43. In 1998, Sestich's employer, its insurer, and the Director of the Office of Workers' Compensation Program moved, under 33 U.S.C. § 922, for modification of Sestich's earlier award and for termination of benefits. Based on Sestich's earnings as a marine clerk, they contended that Sestich's post-injury "wage-earning capacity" was higher than his pre-injury "average weekly wages," and that Sestich was therefore no longer entitled to benefits under the Act. The ALJ granted the motion, terminating Sestich's disability benefits effective February 23, 1998.

Sestich appealed, and the Board affirmed. We affirm the Board.

## Standard of Review

The Board " 'may not substitute its views for those of the ALJ, but instead must accept the ALJ's findings unless they are contrary to the law, irrational, or unsupported by substantial evidence.' " *Deweert v. Stevedoring Servs. of Am.*, 272 F.3d 1241, 1243 (9th Cir.2001) (quoting *King v. Dir., OWCP*, 904 F.2d 17, 18 (9th Cir. 1990)). We review the Board's decision for " 'errors of law and adherence to the substantial evidence standard.' " *Id.* (quoting *Alcala v. Dir., OWCP*, 141 F.3d 942, 944 (9th Cir.1998)). We will "respect the Board's interpretation of the statute where that interpretation is reasonable and reflects the policy underlying the statute." *Rambo v. Dir., OWCP,* 81 F.3d 840, 842 (9th Cir.1996) (quotation marks and citations omitted), *overruled on other grounds by Metropolitan Stevedore Co. v. Rambo (Rambo II),* 521 U.S. 121, 127–28, 117 S.Ct. 1953, 138 L.Ed.2d 327 (1997).

## Discussion

Sestich claims benefits under § 908(c)(21), which limits benefits to "two-thirds of the difference between the employee's preinjury *average weekly wages* and his postinjury *wage-earning capacity,* during the period of his disability." *Potomac Elec. Power Co. v. Dir., OWCP,* 449 U.S. 268, 269–70, 101 S.Ct. 509, 66 L.Ed.2d 446 (1980) (emphasis added). *See also Deweert,* 272 F.3d at 1244; *Sproull v. Dir.,*

*OWCP,* 86 F.3d 895, 898 (9th Cir.1996). Sestich contends that but for his 1988 industrial accident, he would be earning about $134,000 annually as a crane operator, about $25,000 more than his current annual earnings of about $109,000 as a marine clerk. Thus, he contends that, under §§ 908(c)(21) and (h), he is entitled to annual benefits equal to two-thirds of about $25,000. His contentions rest in part on the factual assumption that, absent his back injury, he would be able to obtain certification as a crane operator and to find sufficient work in that job to earn about $134,000. His contentions also rest, in part, on a legal assumption that compensation under the Act is based on the method of calculation employed for ordinary torts.

For purposes of our analysis, we will not quarrel with Sestich's factual assumption. We are willing to assume that if Sestich had not been injured he would be capable of earning about $134,000 annually as a crane operator. We are also willing to assume that if this were an ordinary tort case, Sestich would be entitled to compensation based on his inability, because of his injury, to work as a crane operator. That is, he would be entitled to compensation that would put him in the position that he would have occupied but for the tortious injury.

We do quarrel, however, with Sestich's legal assumption. Contrary to his assumption, benefits under the Act are not calculated in the same way as compensation under the tort system. The Act provides benefits based on "disability," which is defined as "incapacity because of injury to earn the wages which the employee was receiving *at the time of injury* in the same or any other employment . . . ." 33 U.S.C. § 902(10) (emphasis added). That is, disability is not defined, as it would be under the tort system, as the inability to earn hypothetical future wages that the worker could have earned if he had not been injured. Rather, disability is defined under the Act as the difference between the employee's pre-injury "average weekly wages" and his post-injury "wage-earning capacity." *See* § 908(c)(21).

Post-injury "wage-earning capacity" is defined in the Act as follows:

> The wage-earning capacity of an injured employee in cases of partial disability under subdivision (c)(21) of this section . . . shall be determined by his actual earnings if such actual earnings fairly and reasonably represent his wage-earning capacity: *Provided, however,* That if the employee has no actual earnings or his actual earnings do not fairly and reasonably represent his wage-earning capacity, the deputy commissioner may, in the interest of justice, fix such wage-earning capacity as shall be reasonable, having due regard to the nature of his injury, the degree of physical impairment, his usual employment, and any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future.

33 U.S.C. § 908(h) (emphasis in original). Section 908(h) specifies that actual earnings are used to determine "wage-earning capacity," unless for some reason those actual earnings do not fairly and reasonably represent "wage-earning capacity." For example, the injured worker may be earning more than the market rate for someone with his disability because of the (possibly temporary) generosity of his employer. *See Rambo II,* 521 U.S. at 127–28, 117 S.Ct. 1953. In that event, under the proviso contained in § 908(h), the ALJ may fix such other amount as "fairly and reasonably represents [the worker's] wage-earning capacity."

Sestich argues that the proviso of § 908(h) instructs the ALJ to allow benefits equal to the difference between his actual earnings and the wage-earning capacity he would have had if he had not been injured. This argument is based on a misreading of § 908(h). Section 908(h), including its proviso, is designed only to specify the method by which to determine post-injury "wage-earning capacity" within the meaning of the Act. Once "wage-earning capacity" is determined, § 908(c)(21) instructs the ALJ to compare "wage-earning capacity" with pre-injury "average weekly wages" to determine the level of benefits.

In terminating Sestich's benefits, the Board properly analyzed the benefit scheme of the Act. It held that the wages a claimant may have earned "but for" his injury are not taken into account in determining his loss in wage-earning capacity, explaining that:

> [t]he inquiry into a claimant's post-injury wage-earning capacity concerns his *ability to earn wages in his injured condition*, and *not what he could be earning absent injury* .... [T]he Act requires that a claimant's permanent partial disability award be based on a comparison between the claimant's *average weekly wage at the time of injury*, and his *post-injury wage-earning capacity*.

(Emphasis added.).

The Act contemplates that the current dollar amount of post-injury "wage-earning capacity" be adjusted downward (*i.e.*, backward in time) to account for post-injury inflation and general wage increases. This adjustment allows post-injury "wage-earning capacity" to be meaningfully compared to pre-injury "average weekly wages." *See LaFaille v. Benefits Review Bd.*, 884 F.2d 54, 61 (2d Cir.1989); *Walker v. Wash. Metro. Area Transit Auth.*, 793 F.2d 319, 323 n. 5 (D.C.Cir.1986); *Pum-*phrey v. E.C. Ernst, 15 B.R.B.S. 327, 329 (1983). If Sestich's 1998 weekly earnings are adjusted downward (*i.e.*, backward in time) to reflect inflation since the date of his injury, they are $1,508.01. If they are adjusted downward to reflect general wage increases rather than inflation, they are $1,590.29. Using either adjusted 1998 earnings figure as a measure of "wage earning capacity," Sestich's post-injury "wage-earning capacity" as a marine clerk is substantially higher than his pre-injury "average weekly wage" of $921.78.

■ Sestich does not contend that his 1998 earnings as a marine clerk do not "fairly and reasonably" represent what he can earn in his injured state. *See* 33 U.S.C. § 908(h). Nor does Sestich contend that there is a "significant possibility" that his current "wage-earning capacity," as measured by his actual post-injury earnings, will fall below his pre-injury "average weekly wage." *See Rambo II*, 521 U.S. at 136–37, 117 S.Ct. 1953; *Randall v. Comfort Control, Inc.*, 725 F.2d 791, 800 (D.C.Cir.1984); *Hole v. Miami Shipyards Corp.*, 640 F.2d 769, 772 (5th Cir.1981). Because Sestich's adjusted post-injury "wage-earning capacity" is greater than his pre-injury "average weekly wages," the Board was correct in affirming the ALJ's termination of benefits under the Act.

AFFIRMED.